# CHARLESTON.

KEYSTONE MANUFACTURING CO. v. W. H. FISHER

AND

W. H. FISHER v. KEYSTONE MANUFACTURING CO.

Submitted October 17, 1922.   Decided October 24, 1922.

1. APPEAL AND ERROR—*Finding on Trial to the Court on Conflicting Evidence Not Disturbed Unless Against Weight of Evidence.*

   Findings of the trial court sitting in lieu of a jury based upon conflicting oral evidence will not be reversed by this Court, unless there is a clear preponderance of evidence against such findings.   (p. 128).

2. EVIDENCE—*Court Should Adopt Unimpeached Accurate Evidence as Against Inconclusive Estimates in Ascertaining Amount Due for Lumber Delivered.*

   Where the plaintiff, in a suit to recover a balance due him for lumber delivered, bases his claim only upon inconclusive estimates as to the quantities, and the defendant in defense of such suit furnishes unimpeached evidence of the quantities to which the plaintiff is entitled, based upon actual measurements, and inspection, the court should not adopt, in ascertaining the amount due, the plaintiff's inconclusive estimates, but rather the unimpeached evidence based upon actual inspection and count.   (p. 137).

Appeal from and Error to Circuit Court, Randolph County.

Suit by the Keystone Manufacturing Company against W. H. Fisher, and action at law by W. H. Fisher against the Keystone Manufacturing Company.   From a decree in the suit, dismissing the bill to enjoin defendant from manufacturing certain locust lumber into pins and to compel him to discover what transactions or contracts he had made in regard to the subject-matter of the contracts between the parties, plaintiff appeals; and from a judgment in the action for plaintiff for locust pins delivered to defendant, defendant brings error.

*Reversed; Reduced judgment for plaintiff.*

*Spears & Irons,* for plaintiff in error and appellant.

*W. B. & E. L. Maxwell,* for defendant in error and appellee.

RITZ, JUDGE:

These cases involve the reciprocal rights of the parties in relation to a contract for the manufacture and sale of locust pins, and depend for their solution upon the same state of facts, for which reason they will be considered together.

In the first case the plaintiff, Keystone Manufacturing Company sought to enjoin the defendant Fisher from manufacturing certain locust timber into pins, upon the theory that it belonged to it, and also to compel him to discover what transactions or contracts he had made in regard to the subject-matter of the contract between the parties. Upon the hearing the court dismissed this bill. The second suit is an action at law brought by Fisher against the Keystone Manufacturing Company to recover the price of the locust pins manufactured and delivered by him to the defendant, under the terms of the contract. This action was tried by the court in lieu of a jury upon the evidence adduced by both parties in the form of depositions, and the court found in favor of the plaintiff for the sum of $15,097.39, and rendered judgment upon such finding. The Keystone Manufacturing Company seeks to reverse the action of the circuit court in both of said causes.

It appears that in the year 1917, because of the fact that the United States Government had entered upon a program of constructing wooden ships, locust pins, known as treenails, became in great demand. The Keystone Manufacturing Company was engaged in the business of manufacturing lumber at the city of Elkins, and it determined to engage in the business of manufacturing these treenails. It seems that the business was a very profitable one, although rather hazardous because of the fact that it was impossible to determine when the demand for them would cease, and it required the investment of considerable money before production could be started. The Beuna Vista Hardwood Lumber Company was

engaged in the neighborhood of Elkins in producing these pins at that time, and in November, 1917, the Keystone Manufacturing Company bought out the Buena Vista Company. Prior to this purchase Fisher was engaged by the Buena Vista Company in manufacturing these pins for it, and when the Keystone Company acquired the Beuna Vista Company's rights Fisher entered into an arrangement with the Keystone Company to continue the manufacture of the pins for that company. From the latter part of November until the first of March their arrangements were oral, but on or about the first of March, 1918, they entered into a contract in writing which both parties agree was nothing but a statement of their prior oral agreements, and under this written contract their future dealings were had. This contract provided that Fisher would engage in the business of manufacturing pins for the Keystone Company at certain prices stipulated in the contract. The Keystone Company agreed to furnish him, and did furnish him two mills to be used in the manufacture of said pins, he agreeing to take good care of said mills and return them in as good condition as when he received them, ordinary wear and tear excepted. The Keystone Company agreed to take all of the locust treenails manufactured by Fisher, and he agreed to deliver all that he manufactured to the Keystone Company. Fisher agreed to make no more short pins than was absolutely necessary, it appearing that the longer the pins the more desirable they were. The contract further provided that the Keystone Company would advance money to Fisher to be used for the purchase of wood and timber, in which event the timber or wood so purchased would be the property of the Keystone Company, subject to its approval. Fisher agreed by the terms of this contract to continue work thereunder until the first of July, 1918, and it was further agreed that at that time an estimate should be made of all stock cut and on hand, and settlement be made with him of fifty per cent. of the estimated value thereof, and that the same should be thereafter loaded in cars and shipped within ninety days, and the remaining fifty per cent. paid to him as said cars were shipped. It was provided that ship-

ments under the contract during its continuance should be paid for within ten days from date of shipment. It seems that Fisher prosecuted the work under this contract very diligently. He manufactured a large quantity of these tree-nails. A number of cars thereof were shipped by the Keystone Company during the continuance of the contract, and Fisher given credit on his account with the value of these cars. It also appears that considerable money was paid to Fisher during the time the contract was in force, and Fisher charged with all of these sums. On the first day of July, 1917, the Keystone Company had paid Fisher a little more than six hundred dollars in excess of the amount coming to him for pins already shipped. The Keystone Company claims that sometime prior to the first of July, to-wit, about the 20th of June, 1918, Fisher agreed to continue this contract upon the same terms except that he was to have an increase in price after the first of July, and that he in fact did continue it after the first of July until about the 20th of that month. Fisher, on the other hand, contends that he never did agree to continue work under the contract, but that he did agree that he would continue work until he sawed up such timber as was then cut and on hand at the mills for that purpose; that he completed this work about the twentieth of July, and then quit under the contract. From the first to the twentieth of July the Keystone Company had advanced him eight thousand dollars. When Fisher discontinued work under the contract he prepared to enter upon the business of manufacturing these pins upon his own account, and wrote to the Keystone Company inquiring if it would rent him the mills which he had been using under the contract. The Keystone Company claims that this is the first intimation it had that he intended to discontinue working for it. It declined to let him have these mills and undertook to run them itself. It appears that Fisher had bought locust timber from several parties, and some of this had been cut and piled along the railroad ready to be shipped into the mills for manufacture. The Keystone Company undertook to take this wood and Fisher prevented it. It was then that the equity suit was

brought by the Keystone Company, in which it is contended that Fisher had extended this contract after the first of July, 1918, and that in violation of the terms of said extension he ceased work for the Keystone Company and attempted to seize the materials which he had bought for that company under the terms of the contract, and with its money, and which belonged to it, and was attempting to use these materials in his own business; that in addition to these materials then cut and lying along the railroad ready for shipment to the mills, Fisher had purchased a large amount of locust timber still standing in the woods with the money of the Keystone Company, but that the Keystone Company did not know the amount thereof or the parties from whom he had purchased it, or the amounts that he had paid therefor; that he had taken the title to it in his own name, but that he was simply a trustee for the plaintiff in this regard, and the bill sought to enjoin him from seizing any of the wood then cut and ready for shipment to the mills, and to compel him to disclose what locust wood he had contracted for, what he had paid therefor, and to require him to transfer the title to the same to the Keystone Company. A temporary injunction was granted in this case, and the court, on motion, refused to dissolve the same, but did allow Fisher to substitute a bond in the sum of $15,000.00 for the injunction, and to take the wood and continue its manufacture. Fisher then answered the bill and denied that he had bought any of the locust wood which he then had on hand with the plaintiff's money; that in fact most of it was not paid for at all. His practice was to contract for this wood and to pay for it as it was brought into the mill by the thousand feet, or by the cord, and that all of the monies which the Keystone Company had advanced to him, and which he used for the purchase of wood was for the purchase of such timber as had already been manufactured into pins and delivered to that company. He denied that he had ever agreed to extend the contract further than to manufacture such timber as was on hand at the mills on the first of July, and denied specifically that he had any wood, or had contracted for any wood, in which the Keystone

Company had any interest. On a hearing of the case, after full proof was taken, the court below decided that the Keystone Company was not entitled to any relief, and dismissed its bill.

Sometime after the equity suit was brought, and while it was still pending, and after the expiration of ninety days from the termination of the contract between the parties Fisher brought an action of assumpsit against the Keystone Company to recover the value of the pins delivered by him to that company. This case, together with the equity suit, was, by agreement of the parties, referred to a commissioner who took all of the evidence and made findings of fact. The court confirmed his findings of fact in favor of the plaintiff in this case, and rendered judgment as above mentioned. The Keystone Manufacturing Company then prosecuted an appeal to review the decree dismissing the equity suit, and a writ of error to review the judgment rendered in the law suit.

It is first contended by the Keystone Company that it was entitled to relief in the equity suit, and that the court committed serious error to its prejudice in dismissing that suit; that while the court had permitted Fisher to take the timber by substituting a bond therefor, and it could no longer get the specific property it was seeking, still it was entitled to have the court determine the compensation to which it was entitled for that property, and render a decree in its favor therefor. Of course, this would be true in case the court was of opinion that it was entitled to have the property which it sought by its bill, but the court below found that the Keystone Company did not make out the case alleged in its bill. The right of the Keystone Company to have relief in the equity suit depended in a very large measure upon whether the contract between it and Fisher had been extended by mutual agreement after the first of July, 1918, as contended for by it, instead of as contended for by Fisher. If the contention of Fisher in this regard is correct that he only agreed to continue at work until he manufactured the timber then on hand at the mills, then the grounds upon which the Keystone Company relied for relief are considerably limited.

The evidence as to what the agreement of the parties was on this question of extension is highly conflicting. Mason, the president of the Keystone Company, testifies unequivocally that Fisher agreed to continue manufacturing the pins for the Keystone Company under the terms of the contract, and agreed to have the extension reduced to writing by his lawyer so that it could be formally signed by the parties. He does not testify as to how long this extension was to continue, but simply that it was to be upon the same terms provided by the original contract in writing, except that Fisher was to have increased compensation. Fisher, on the other hand, is just as emphatic that he did not agree to do any such thing, but simply agreed to manufacture the wood then on hand at the mills, and this he did. He is corroborated in some respects by some correspondence which passed between the parties between the first and the twentieth of July. However this may be, the court below, upon this conflicting evidence, found that the Keystone Company had not sufficiently proven this allegation of its bill, and found for Fisher thereon, and also expressed the further opinion that even though it had been proven, inasmuch as there was no limit of time within which Fisher was to continue at work under the extension as testified to by Mason, he might be at liberty to quit at any time, and that even assuming that the extension of the contract was as testified to by Mason, that Fisher did not violate this extension of it by discontinuing work on the twentieth of July. The court below, having found in favor of Fisher upon this disputed question of fact, we are not disposed to disturb his finding. There is no clear preponderance of evidence in favor of the Keystone Company upon this issue. In fact, as stated by the court below, the preponderance is rather in favor of Fisher.

The Keystone Company, however, insists that even though the contract was not extended, and Fisher was under no obligation to continue at work for it, still it is entitled to relief in the equity suit upon the facts shown in this case. The relief to which it claims it is entitled is compensation for certain timber which Fisher took and manufactured into pins,

and which it claims it was entitled to have for that purpose, and was the very timber which it sought by injunction to prevent Fisher from taking, and to compel him to surrender to it. This timber consisted of the locust from four small tracts of land, known as the Armentrout timber, the James Cooper timber, the Hoy Cooper timber, and the Judy timber. It is contended by the Keystone Company that the Armentrout timber was purchased by it from the Beuna Vista Hardwood Company at the time it took over that company's business in November, 1917, and by it turned over to Fisher to be manufactured under the terms of the contract, and Fisher admits that this is the case. As to the other three tracts of timber mentioned, it is contended by the Keystone Company that Fisher purchased or arranged to purchase these tracts of timber during the time he was working for it under his contract, and with its money, and that it was entitled to have the benefit of those tracts. Fisher admits that as to two of the tracts of timber he did contract for their purchase during the time he was working under the contract, but that he did not pay any of the Keystone Company's money therefor. In fact, it rather appears that he had not paid any money at all therefor, but that the same was to be paid for as delivered at the mills to be cut, and that as to the other tract of timber he had entered into negotiations in regard to it, but did not buy it because it was rather remote from his operations, and unless he could secure other timber in the same neighborhood he would not be justified in making the purchase; that he subsequently did arrange to secure other timber in the same neighborhood and then made a contract for the purchase of the particular tract mentioned. In regard to the Armentrout timber, it very clearly appears that all of this timber that was ever cut was manufactured into pins by Fisher and delivered to the Keystone Company. It appears from the evidence of several witnesses that when Fisher ceased cutting this timber there were about twelve or thirteen cords left unsawed which the witnesses say consisted of culls and rejected timber, and the owner of the timber, Mr. Armentrout, says that

there were 753 cords of the timber cut and delivered at the mill to be sawed; that he was paid for 740 cords which were sawed into pins and delivered to the Keystone Manufacturing Company, and that the remaining thirteen cords was rejected timber, and that the same never was cut into pins, but still remains on the ground, with the exception of part thereof which he used in building fences and for other purposes. It is true, a witness introduced by the Keystone Company testified that Fisher hauled away some of this wood after he quit sawing for the Keystone Company, but this witness stands alone upon this proposition, and we are inclined to think that he must be mistaken as to that contention. At any rate, the court below found that Fisher was not in default in regard to this Armentrout timber, and we think the evidence fully justified that finding. The Keystone Company contends that in any event the purchases made by Fisher of the Cooper timber and the Judy timber must be held to be for its benefit, inasmuch as it at all times had advanced money to Fisher in excess of the pins actually shipped by it, its contention being that whatever Fisher did in the way of purchasing locust timber he did as its agent. When we look at the contract and the acts of the parties in performance of it, we are not at all convinced that Fisher was the agent of the Keystone Company in all the transactions by him in relation to locust timber. It appears that the particular timber involved here was contracted for by Fisher. The practice, it also seems, was to pay for the timber when the same was cut and delivered. There is a provision in the contract by which the Keystone Company agreed to advance money to Fisher with which to buy timber, in which case the same should belong to it, and should be approved by it, but it does not appear that Fisher ever called upon the Keystone Company to perform its obligation under this provision of the contract. The contract contemplated that Fisher should furnish all of the timber and all of the labor and manufacture the pins and receive a certain amount therefor. It was evidently contemplated by the parties that a condition might arise where Fisher himself would not have enough money to buy a tract

of timber, in which event the Keystone Company would buy it for him, or furnish the money to buy it for him, take the title in its own name, and then turn it over to him at the price at which it bought it, to be manufactured into pins under the contract. The condition never arose requiring this to be done. Fisher was able at all times to acquire all the timber that he needed for carrying on the operations without calling on the Keystone Company to purchase any, and pay for it in advance. It satisfactorily appears that not only was this timber not paid for by the Keystone Company, but it was not paid for at all until it was cut and taken up, and this was not until after the contract expired. We do not think the court erred in finding that the Keystone Company failed to make a case for relief in the equity suit, and in dismissing the same. That decree will therefore be affirmed.

There are but two questions presented for solution upon the writ of error in the law suit. One is presented by an assignment of error made by the Keystone Company, and the other by Fisher's cross assignment of error. The Keystone Company claims, by its assignment of error, that the court found against it a much larger amount than the evidence justified, and that this was due to the court accepting an estimate made by Fisher as to the quantity of pins on hand on the 20th of December, 1918, instead of adopting the evidence of actual measurements and count as to this quantity. Fisher claims that the court erred in not finding that he was entitled to a considerably larger sum than it did, and this contention of Fisher is based upon the fact that when these pins were shipped to the Government, frequently pins an inch and a half square were shipped as inch and three-eighths pins, and accounted to him as inch and three-eights pins, and in many cases pins were also accounted for at a shorter length than those actually shipped, in this way giving him a less quantity of wood, his contract being by the thousand feet, than he actually furnished, and he claims that the court should have corrected the measurements of the cars and made them correspond with the actual facts instead of with the bills issued for them upon the government inspection. It seems that

when Fisher began to manufacture these pins it was the understanding, which is expressed in the contract, that all pins should be either one and one-half or one and three-eights inches square, and that Fisher would cut them of these dimensions as ordered by the Keystone Company.    The showing is that the needs of the Government required that the pins of longer length be made one and one-half inches square, and those of shorter length one and three-eights inches square. It also appears that the Government desired as many pins of the longer lengths as it was possible to obtain, its requirements for the pins of shorter lengths being comparatively small.   It also appears that the pins of the shorter lengths were produced by cutting out defects in the pins of longer lengths.   When the Government inspectors rejected a pin of one of the longer lengths for some defect, the pin was taken to the mill and that defect cut out, and one pin of a shorter length, or perhaps two, made out of it.   These shorter pins, as above stated, were to be one and three-eights inches square, but in order to make them of this dimension it would be necessary to again put them through the mill and saw them down from one and one-half inches square to one and three-eights inches square.   The government was perfectly willing to accept the pins one and one-half inches square on its order for pins one and three-eighths inches square, but it was not willing to pay for more than one and three-eights inches, inasmuch as this would meet its requirements, and the Keystone Company shows, and we think very satisfactorily, that it was agreed by the parties that, while these short pins were one and one-half inches square, they should be shipped and accounted for as one and three-eights inches square, because to do this was to the advantage of all the parties interested. It saved the expense of again sawing them in order to reduce them to smaller dimensions.   It also appears that in some instances the pins were accounted for as of a shorter length than they really were.   The Keystone Company attempts to show that this was done under an arrangement with Fisher that whenever an order for pins was sent in by the Government agencies he would furnish these pins of the lengths re-

quired, and in case he did not have the exact lengths required that the Government would accept the next longer pins in lieu thereof. In this way, in a number of cases, he shipped pins longer than those ordered, but only received pay for them as though they were the ones actually ordered. This course of conduct continued throughout the continuance of the contract and was acquiesced in by Fisher, and, it is claimed by the Keystone Company, positively and specifically, agreed to by him. He denies that he ever agreed to it, but insists that he always demanded payment for the full amount of wood shipped, and introduced a letter in which he protested on one occasion in regard to the matter. This letter is explained by the Keystone Company by showing that in this case the shipments were not made to the Government under the arrangement above specified, but to another party, and that Fisher's contention in regard to these shipments was correct, and adjustments were made between them. It occurs to us that the court's finding upon this question is clearly justified by the evidence, and we are not disposed to interfere with it.

This leaves for consideration only the question, whether the court below correctly ascertained the pins remaining unshipped at the expiration of the ninety days from the time Fisher discontinued the work for the Keystone Company. The contract, by its own terms, expired on the first of July, but the court below held that by agreement of the parties the date of expiration was changed to the twentieth of July, and upon the evidence which we have before referred to we think this conclusion was justified. Under the terms of the contract Fisher was entitled to receive on the twentieth of July fifty per cent. of the estimated value of the pins on hand at that time unshipped. All pins already shipped had been paid for, and in addition to this, between the first and twentieth of July, he had been advanced the sum of eight thousand dollars. The court, in ascertaining what Fisher was entitled to receive on the twentieth of July as the fifty per cent. of the estimated amount of pins then on hand, ascertained the amount of pins shipped between the twentieth

of July and the twentieth of December, and to this quantity added the amount which Fisher estimated was still on hand on that day, and found that Fisher was entitled to receive one-half of the amount thus ascertained on the twentieth of July, after charging him with the eight thousand dollars, as well as some other little balances.   He was then given credit for one-half of the amount on each car thereafter shipped, and at the end of the ninety days from July twentieth he was given credit with the remainder of the one-half for which he had not been credited on the twentieth of July.  The Keystone Company contends that Fisher's estimate of the number of pins on hand on the twentieth of December, 1918, was entirely too unreliable upon which to base a judgment, and that it furnished the court very much more reliable evidence which the court should have adopted in ascertaining the balance due Fisher.  As to the pins actually shipped between the 20th of July and the 20th of December, 1918, there is practically no dispute.  Both parties arrive at this amount in exactly the same way.  They get it from the report of the Government inspectors who took up the pins during that time.  As to the amount of pins remaining on hand on the 20th of December, 1918, the Keystone Company says that it furnishes the only reliable evidence upon which the court could form a correct judgment. It shows that just prior to the 20th of December and after the war was over it collected all of these pins manufactured by Fisher at one place.  They were at the time the war ceased piled at four different places.  The Keystone Company loaded the pins at three of these places in cars, and had them shipped to the fourth place, where they were all stacked and cared for.   Negotiations were entered into then with the Government agents in regard to settlement for pins which had been cut under contract with the Government, and not yet taken up, some of these pins being of that class.  In the fall of 1919 a settlement was reached by which the Government took up all pins which it had contracted for and paid for the same.  Among the pins so taken up were several cars of these Fisher pins. The Government inspectors were

sent to the place where these pins were stored and they loaded all of the pins which came within the terms of the Government contract. The inspection and measurement of these inspectors as to these cars was produced, and it is insisted that the court must adopt this, for the reason that the contract itself provides that the inspection of the Government inspectors shall be final and binding upon the parties. If this Government inspection included all of the pins, there would be little trouble in the case, and we would immediately hold that the court must adopt this measure for ascertaining the amount of pins on hand. But it appears that there were quite a number of these pins that were of shorter lengths than the Government had contracted to take. As to these shorter lengths there were several carloads shipped by the Keystone Company to other customers. It appears that it secured the services of an inspector, whose qualifications are not at all attacked, to inspect and load these cars and the quantities which he loaded into each of the cars are shown by his testimony. There can be little doubt but that his testimony in regard to the quantities loaded into these cars is correct. No attempt is made to impeach it. But after loading these cars there still remained a considerable quantity of the short pins, and it appears that even at the time of the trial of this case some of them were still on hand undisposed of. After the cars last above referred to were loaded the Keystone Company had this inspector inspect all of the remaining pins and calculate the quantity thereof which would pass the Government inspection and comply with the terms of the contract. It appears that just before it did this Fisher was notified that at a certain time it proposed to inspect these pins for the purpose of determining the basis upon which to make a settlement with him, and he was asked to be present and assist in making the inspection, and see that the quantities were properly ascertained. He promised to do so, but did not appear. The inspector who made this inspection testifies that he made it strictly in accordance with the government requirements, and he gives the exact number of pins and the quantity in feet which remained after the shipment

of the cars above referred to. This is no estimate upon his part. It is from an exact count, and the Keystone Company insists that this should have been made the basis of the court's finding instead of the estimate made by Fisher on December 20, 1918. This estimate made by Fisher, it appears from his testimony, was simply made of the pins in stacks. He counted the number of pins the stacks were high and the number of pins long, and the number of stacks, and in this way arrived at the number of pins in all of the stacks. He made no actual count of the pins, nor any inspection of them. The pins, it appears, were piled on the ground, and it does not at all satisfactorily appear that a count of the number of pins at one end of the stack would fairly represent the height of the stack for its full length. This estimate is also attacked for another reason, Fisher testifies that he made this estimate about the 20th of December, while it is proved beyond peradventure that the pins had been removed before that time and all stored at one place. It is urged that Fisher is, perhaps, mistaken as to the date upon which he made the estimate, and this must have been. true, for it is shown that some of these pins were removed from some of these places in November. It would not be so material as to the date were it not for the fact that the Keystone Company was shipping pins to the Government during all of this time, and all of the cars which it shipped to the Government are charged for by Fisher at the actual measurements, so that if he made the estimate upon which he bases his conclusion in the month of November, and the Keystone Company shipped pins after that time to the Government which are also included in his calculation, there would be a double charge therefor, so that the date upon which Fisher actually made this estimate is very material, and unless it is fixed accurately the worthlessness of the estimate as evidence is apparent, for it cannot be determined how many of the pins shipped to the Government were shipped before and how many after his estimate unless it is known exactly when that estimate was made.

Upon the whole case we are of opinion that Fisher did not furnish a satisfactory basis for ascertaining the amount due

him. If there was no more satisfactory evidence than that produced by Fisher, it might suffice, but when the other party to the suit produced figures based on actual counts and exact measurements by parties who are admittedly competent, we think it was the duty of the court to adopt this more satisfactory and more reliable basis as the one upon which the settlement should be made.

We will, therefore, reverse the judgment, set aside the findings of the circuit court, find for the plaintiff the sum of $9788.05, being the amount due based upon the Keystone Company's calculations, as of the 12th day of October, 1921, that being the date of the judgment rendered by the circuit court in this case, and render judgment in favor of the plaintiff for that amount, with interest from said date until paid.

*Reversed; Reduced judgment for plaintiff.*